# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CEASAR AVILA,**

          Plaintiff,

       **-vs-**                  **Case No. 12-C-1201**

**BOARD OF REGENTS OF THE**
**UNIVERSITY OF WISCONSIN SYSTEM,**

          Defendant.

---

# DECISION AND ORDER

---

Plaintiff Ceasar Avila ("Avila"), who is Hispanic, filed this civil rights action pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII") and 42 U.S.C. § 1981, against the Defendant Board of Regents of the University of Wisconsin System (the "Board") alleging that while employed as a lead custodian at the University of Wisconsin-Parkside ("UW Parkside") he was subjected to a pattern of adverse actions because of his national origin, and retaliation because he complained of such discrimination. This Decision and Order addresses the Board's motion for summary judgment dismissing this action (ECF No. 22).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.* at 324*;* Fed. R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, the Court must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson,* 477 U.S. at 255. In addition, the Court applies "the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000) (citation omitted); *see Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007) (stressing that the court cannot make credibility determinations, weigh evidence, and either draw or reject inferences at the summary judgment stage).

Unless otherwise noted, the facts set forth below are undisputed and culled from the parties' Civil Local Rule 56 proposed findings of fact ("PFOF"). The Board objects to some of Avila's proposed findings, asserting they are argumentative, speculative, and conclusory, citing *Ferguson v. Med. Coll. of Wis.,* 471 F. Supp. 2d 901, 905 (E.D. Wis. 2007) (citing *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this [Rule 56(e)]requirement"). The Board also asserts that some proposed findings are improper because they are based on Avila's opinion. In that regard, the Court of Appeals has explained:

> Oral testimony if admissible will normally suffice to establish a genuine issue of material fact, though the qualification 'if admissible' is important, particularly in discrimination cases; a plaintiff cannot get to the jury merely by testifying that [he] thought the employer or other alleged discriminator had a discriminatory purpose. . . . Plaintiffs cannot qualify as mind readers. But a plaintiff can testify, . . . that [he] made a phone call and said thus-and-so in the ensuing conversation, or left a message on an answering machine . . . that said thus-and-so.

*Randolph v. Ind. Reg'l Council of Carpenters & Millwrights,* 453 F.3d 413, 416 (7th Cir. 2006).

To the extent that either party objected to certain statements of fact, the Court relies only on admissible evidence for purposes of its analysis. *See, e.g., Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial.") All objections not specifically addressed have been considered.

### *Avila's Job History and Duties*

Avila worked at UW Parkside from February 1997 until his resignation in March 2001. Avila's evaluations during this time indicated that "his overall rating was meeting expectations." (Avila Aff. ¶ 5, Ex. 1, EEOC 000171, 167.) (ECF No. 37.) Avila did not complain of discrimination during this period of employment.

In September 2005, UW Parkside re-employed Avila as an LTE ("limited term employee") custodian. His supervisor was Paula Deden ("Deden") until her resignation in 2007. Avila did not complain of discrimination while Deden was his supervisor.

Avila's probationary service report as a lead custodian from March to September 2006, approved by Deden, recommended him for a permanent appointment. The report states:

> [Avila's] accuracy, quality of work performance

and job knowledge providing custodial services including stripping and waxing floors, sweeping, dusting, vacuuming, mopping, trash and recycling, offices, toilets, hallways and stairs has continued to be very good.

[Avila] has done a very good job of taking on the responsibility of organizing and stocking the custodial cage area.

. . .

[Avila's] overall job performance, rate of learning and quality of work as lead custodian has been very good. [Avila] works well with other employees and has a positive work attitude. [Avila] also readily accepts any job assignment or extra duties when required with an acceptable rate of learning.

[Avila] has missed some days but was within the allowable limits.

(Avila Aff. ¶ 6, Ex. 1, EEOC 000173.)

Avila became a permanent employee, and from about March 2006 until July 2009 he worked as a third shift lead custodian. Avila's work hours were from 10:00 p.m. until 6:00 a.m. Sunday through Thursday. His job duties and responsibilities included providing custodial services, operating and caring for custodial equipment, providing campus window washing functions, properly and safely setting up scaffolding and high lift equipment, operating and working from high lift and boom trucks, providing group leadership in the supervisor's absence, coordinating

custodial activities and work assignments, handing out and collecting keys, taking phone messages and processing emergency calls.

After Deden's resignation, Avila's supervisors were Charles Lott ("Lott") and Shaunte Stills ("Stills"), both of whom are African-American men. Lott became the department supervisor in 2005 and supervised all 23 custodians in the department. Stills was Avila's direct shift supervisor and reported to Lott.

### FMLA Leave at UW Parkside

An employee requesting FMLA leave was required to complete and sign a UW Parkside Leave of Absence/FMLA form ("FMLA form"). The FMLA form states:

> I hereby apply for a leave of absence for the purpose indicated above. **I understand that if I fail to report for work on or before the scheduled return date indicated above or fail to contact my supervisor regarding my absence from work beyond such scheduled date of return, my employer may take disciplinary action against me, which may include termination for cause effective the date the leave expired.**
>
> If eligible for FMLA, I certify that I understand, agree to, and meet the requirements and conditions of the [FMLA]. I authorize the appointing authority to obtain any necessary information regarding my request for family and medical leave. Alternatively, I will obtain and

submit medical documentation upon request.

(Emphasis added).  (Johnson Aff. ¶ 1,[1] Ex. 1, 1006-1.)  (ECF No. 26-1.)

Neither Lott nor Stills had the authority to approve or deny requests for FMLA leave, nor did they have the authority to tell an employee when he or she could request FMLA leave.  The following decision-making process applied to FMLA requests: (1) the employee's supervisor recommended approval/not approval; (2) the Dean or Director of the employee's department recommended approval/not approval; (3) the FMLA form and the employee's file were reviewed by the human resources office which determined: (1) if the leave qualified for FMLA; (2) whether the appropriate FMLA information was attached; and (3) whether or not the request was approved, listing reasons/comments.  The FMLA allowed for up to 12 weeks of leave; however a union employee was allowed more leave — six months was available under the union contract applicable to Avila. If an employee who had been approved for leave required an extension of that leave, a doctor's letter was required.

At all times relevant to this action, Sylvia Coronado-Romero ("Coronado-Romero") was UW Parkside's human resources director.

---

[1] Elaine Johnson ("Johnson") is currently UW Parkside's human resources office director and has access to the regularly maintained business records, including current and former employees' personnel files.

Carolyn Lawton ("Lawton") was an advanced human resources manager from August 2007 until June 2011. Lawton's job included jointly monitoring FMLA hours, worker's compensation, and any disciplinary issues and grievances.

If an employee was on leave for medical reasons, the human resources director or her designee would request a letter from the employee's doctor with an expected return-to-work date. If the doctor's letter indicated that there was no foreseeable date the employee could return to work and the employee exhausted his leave time, he was medically discharged with eligibility to be rehired if the medical condition changed. The decision to terminate employment for medical reasons was based solely on the length of time the employee would miss work with no return date in sight. The termination decision was not made without a medical opinion; sometimes a second opinion was obtained. UW Parkside tried to give the employee as much time as possible, and made exceptions to the six-month leave limit when its enforcement would have been unreasonable — for instance, an extension was granted to an employee whose doctor indicated that he would be able to return to work five days after his six months of leave expired. (Davey Aff. ¶ 2, Ex. A (Lawton Dep.) 22-24.) (ECF Nos. 36, 36-1.) Lawton's practice was to consult with the

employee's supervisor prior to terminating an employee. However, the supervisor only made a recommendation or provided input, he did not make the final termination decision.

### *Circumstances Relating to Avila's Claims*

Avila was absent from work on April 29 and 30, 2007, and those absences were addressed in a May 14 pre-investigatory meeting. Lott informed Avila that he had violated the sick leave guidelines and the facilities management vacation policy. Although Avila was not disciplined, he was notified that any further violations would lead to disciplinary action.

Avila complained to Lott that he was not being treated like the two white lead custodians. Avila said Lott was requiring that he perform the more manual and physical work of a regular custodian, rather than having him direct other custodians' work. Lott told him it did not matter and that he should just do the work, but Avila could see that Lott was offended and upset by his complaint. After Avila voiced this complaint, Lott presented a written claim of July 17 work rule violations by Avila.

Avila received a memo from Lott notifying him of an investigatory meeting regarding Avila's alleged violation of three classified employee work rules. (Avila Aff. ¶ 11.) Avila received a reprimand based on one of

the violations: a determination that he failed to complete assigned tasks on July 17. Avila disputes the reprimand, asserting that he was given an overwhelming amount of tasks to perform and that Lott wrote him up when he was unable to get all of them done. Avila prepared a time-line of all the tasks he performed that day to establish that he was working the entire time, and he provided the timeline at the investigatory and pre-disciplinary hearings.

The other two work rule violations Lott alleged were not found to be a basis for discipline, and Avila believes they were a set up. One of the allegations was that Avila lost his work keys. Avila avers that he left the keys and his radio on Lott's desk (Avila Aff. ¶ 12), and they were missing when Avila returned to retrieve them. Lott said he knew nothing about them. The items were later found by Stills. Avila is "certain he did not lose or misplace his keys and that Lott took the keys so he could write [Avila] up for a work rule violation. [Avila] reported the matter to [the Office of Equity and Diversity ("OED")], and the keys reappeared in a week under peculiar circumstances." (*Id.* at ¶ 14.)

Avila filed an informal complaint with OED, claiming that Lott was treating him unfairly. Eugene Fujimoto ("Fujimoto"), UW Parkside's assistant to the Chancellor for Equity and Diversity in OED, met

informally with Lott to inform him of the concerns raised by Avila. Fujimoto's duties included conducting investigations in response to complaints filed with the OED by employees.[2]

After Avila filed his informal complaint, Lott confronted Avila in a back room where Avila was cleaning a machine. Lott was angry, he yelled and cursed at Avila about the complaint, and said that he was not going to see Fujimoto again without bringing a lawyer because someone was saying something about being treated unfairly. (Avila Aff. ¶ 22.) On August 8, Avila received a memo from Lott notifying him of an investigatory meeting regarding additional alleged work rule violations.

On August 16, Avila filed a formal complaint with the OED claiming that Lott had discriminated against him and harassed him based upon his racial and ethnic background and retaliated against him for expressing his concerns to Lott and to the OED. Avila also claims that after he made the complaint, Lott was angry and told Avila, "don't talk to me about the fucking keys." (Kilpatrick Aff. ¶ 3, Ex. 1 1017-003.) (ECF Nos. 30, 30-1.)

On August 17, Avila received a memo notifying him of a pre-disciplinary meeting regarding work rule violations. On August 20, Avila

---

[2] The parties disagree regarding whether Fujimoto's investigation of Avila's complaint was "confidential" because Fujimoto spoke to Lott, Stills, and other personnel in the custodial department. (*See* Pl. Resp. Def. PFOF ¶ 19.)

received a memorandum from Lott notifying him that an investigatory meeting was scheduled on August 30 regarding Avila's alleged violation of attendance/punctuality work rules.

Avila stated that he left telephone messages regarding an absence, and he believed Lott erased the messages so he could write Avila up for work rule violations. (Avila Aff. ¶ 19.) After Avila produced phone records proving he had called work twice (*Id.*, Ex. 2) the incident was blamed on the university phone system, but Avila was given the call-in procedure and classified employee work rules and was told he was expected to follow them. (*Id.*) Avila had never heard of a message being lost by the department; he knew many co-workers who did not call in, or called in after the shift began, and were not disciplined; and sometimes supervisors called employees and woke them up.[3] (*Id.* at ¶ 19-20.)

By a letter sent September 25, Lott provided Avila official notice of a written reprimand based on Avila's failure to complete his assigned tasks on July 17, which Lott asserted placed an undue burden on Avila's co-workers. The letter stated that Avila was "on notice that any further violation of the work rules will result in further disciplinary action, up to

---

[3] The Board objects to the findings in this paragraph, contending they are argumentative, speculative, conclusory, and only supported by Avila's own opinion, citing *Ferguson,* 471 F. Supp. 2d at 905. The objection is overruled because Avila could lay a foundation establishing his personal knowledge of such facts.

and including discharge." (Avila Aff. ¶ 25.)  On October 1, a letter was sent to Avila which corrected the name of the hall where the alleged July 17 negligence occurred.  The revised letter was official notice of the written reprimand.  Avila grieved the September 25/October 1 written reprimand, and the grievance was denied at the first stage.

Avila accuses Lott of using anti-Hispanic language at work.  Avila maintains that on an unspecified date, Lott used the term "spic and span," emphasizing the word "spic," while talking to him about one of his cleaning duties.  (*Id.* at ¶ 24.)

After investigating Avila's August 16 formal complaint, Fujimoto's October 2007 report indicated that Lott and Stills were very complimentary of Avila's skills as a custodian, stating that Avila was "one of the best workers they [had]," and mentioning Avila's desire to be a supervisor.  (Fujimoto Aff. ¶ 4, Ex. 1 1000-006, ¶ (c).)  Lott told Fujimoto that the disciplinary action for not completing the July 17 work assignment was "the first and only time that a custodial member had failed to complete an assignment (unless it was unforeseen circumstances that were promptly communicated to the supervisor) in approximately 2½ years."  (*Id.* at 1000-004.)  Fujimoto's report recommended that contact between Lott and Avila

be minimized over the next three months.  (*Id.* at 1000-007.)[4]

Fujimoto sent Avila a memorandum with his findings and the following conclusions:

> a. There is insufficient evidence to conclude that Charles Lott discriminated and/or harassed Ceasar Avila based upon Mr. Avila's racial/ethnic background;

> b. There is insufficient evidence to conclude that Charles Lott acted against Ceasar Avila in retaliation for Mr. Avila speaking his concerns to both Mr. Lott and to the [OED];

> c. There is reason to believe that Charles Lott's behavior as a supervisor may have contributed to Mr. Avila's misperception that harassment and discrimination had occurred.  This behavior from Mr. Lott included a lack of clear and effective communication in several instances including assignment of duties, follow through on requests made by Mr. Avila, and disciplinary action; and

> d. On numerous occasions, the issue of attendance of custodial employees arose in the conversations. There is reason to believe that the misuse of the [FMLA] and the sick leave policy implementation may be contributing.

(Fujimoto Aff. ¶ 5, Ex. 2 1001-001.)  Lott was told to minimize his contact with Avila.

---

[4] The Board objected to paragraphs 27, 28, and 29 of Avila's PFOF, which provide the basis for the above, as not being accompanied by citations specific enough to allow it or the Court to locate them in the cited exhibits.  However, the Court determined that the citations mistakenly referred to the exhibit numbers as 1000-1006, -1004, and -1007 and was able to locate them at 1000-006, -004, and -007.  The objection is overruled.

In February 2008, Avila filed a formal complaint against Lott that included the following claims:

> a. Mr. Lott has not complied with the recommendations in the October 22, 2007 complaint investigation findings stating that "contact between Mr. Lott and Mr. Avila will be minimized over the next three month period and work schedules adjusted to accommodate this;"
>
> b. Mr. Lott has harassed and intimidated Mr. Avila to not use [FMLA] benefits when Mr. Avila has documented the need to use FMLA;
>
> c. Mr. Lott has upon several occasions, taken unfair actions against Mr. Avila. These actions including demoting Mr. Avila's "job position" and scrutinizing Mr. Avila's work performance to a greater degree than other workers.

(Fujimoto Aff. ¶ 6, Ex. 3 1002-001.)

During a meeting in Fujimoto's office, Fujimoto told Avila, "you know . . . you run the chance of getting disciplined for filing complaints." (Avila Aff.¶ 28, Ex. 3 Emails 058.)

Fujimoto investigated Avila's February complaint and prepared a report. Fujimoto sent Avila a memorandum informing him of his findings and the following conclusions:

> a. There is insufficient evidence to conclude that Charles Lott has not complied with the recommendations from the October 22, 2007 complaint investigation findings that "contact between Mr. Lott and Mr. Avila be minimized over

the next three month period and work schedules adjusted to accommodate this;"

b. There is insufficient evidence to conclude that Charles Lott has harassed and intimidated Mr. Avila to not use [FMLA] benefits;

c. There is insufficient evidence to conclude that Charles Lott has taken unfair actions against Ceasar Avila. These alleged actions include demoting Mr. Avila's "job position" and scrutinizing Mr. Avila's work performance to a greater degree than other workers.

(Fujimoto Aff. ¶ 8, Ex. 5 1004-001.)

On April 13, Lott and Stills gave Avila an employee performance and development review indicating that he did not meet expectations in four out of five categories. Avila disputed the evaluation, considered it to be another act of discrimination and retaliation, and refused to sign the evaluation. (Avila Aff. ¶¶ 29, 30, Ex. 5 EEOC 000181.)

According to Avila, sometime in June 2008 he overheard Lott say "no wetback is funna (slang)[5] get rid of me," while talking to Stills. (*Id*. at ¶ 31.)[6] Avila did not see Lott talking to Stills, but he recognized their voices; nor did Avila hear his name mentioned in the conversation, but it

---

[5] "Funna" is a contraction of "fucking" and "gonna." *See urbandictionary.com* (last visited Feb. 5, 2015.)

[6] There is a factual dispute regarding where the conversation occurred. (*See* Def. Reply Pl. Response Def. PFOF ¶ 52, 55.) (ECF No. 42.) Avila avers that he made a mistake in a discovery response when he identified the location as Greenquist Hall and that the correct location is Wylie [sic] Hall, where Fujimoto's office was located. (Avila Aff. ¶ 31.)

was obvious to Avila, as the only Hispanic in the department, that Lott was referring to him.

In August, a violation was issued to Avila because he had walked out of a July 25 meeting discussing the type of time off he could use for rehabilitation for a work-related injury. The memorandum stated that as long as Avila understood walking out of a meeting before it ended was not acceptable, no further action would be taken. Avila said he understood, and no further action was taken.[7] During the meeting, Avila was not told he was receiving informal counseling. (Avila Aff. ¶ 32.)

In September 2008, an investigatory meeting was conducted that Avila did not attend. He had become exasperated by the many memos and letters regarding investigatory meetings and told Donald A. Kolbe ("Kolbe"), the Director of Facilities Management, that it was crazy and harassment, and he did not want to attend because the meetings were stressful. (Avila Aff. ¶ 33.) Kolbe said the meetings were voluntary and Avila did not have to go. (*Id*.)

On September 19, Avila sent an email to Rita Altmeyer@uwp.edu,

---

[7] Avila admits that the summary of the memorandum is correct, but denies that "this" occurred, citing paragraph 32 of his affidavit. (*See* Pl. Resp. Def. PFOF ¶ 56.) (ECF No. 39.) Avila avers that he was not told he was receiving informal counseling; however, he does not mention the discussion of walking out of a meeting or his acquiescence. Thus, Avila has not raised a factual dispute regarding those two occurrences.

Kolbe, and Coronado-Romero informing them that he wanted to file a formal complaint regarding discrimination and harassment by Lott and Stills. The email stated, "I have no questions to as if . . . Lott is discriminating against me because of my race because I overheard him say 'no wetback is funna [sic] get rid of me' in the month of June 2008." (Avila Aff. ¶ 35, Ex. 3 Emails 058.) The email also stated that Avila was treated differently from black custodian Mike Redmond ("Redmond"), who was allowed to leave early while Avila was not; that Avila's request to use flex time to get away from Lott and to attempt to avoid any contact with him was denied, but a first shift white female custodian, Deanie Burk, had been allowed to use flex time for years, and another white female custodian, Mary on "day shift," was allowed to set her own hours, arriving at and departing from work as she pleased. (Avila Aff. ¶ 36, Ex. 3 Emails 058.) Avila's email also stated that a black lead custodian on his shift and two white custodians on the first shift were provided radios, but he was not; that he was not allowed to use the riding scrubber to scrub hallways in the winter, but two white male lead custodians and a white custodian were; and that he was written up for negligence and failure to comply with safety regulations for "petty things he did not do," while more serious offenses committed by non-Hispanic custodians were not written up. Avila provided

examples of a female custodian who allowed a $1000 walk-behind scrubber to fall off the loading dock and break into pieces, and a white custodian who dropped his radio into the toilet. (Avila Aff. ¶ 37.)

On September 22, Stills sent Avila a memorandum as a follow-up to an investigatory meeting that Avila had not attended. The memorandum stated that it was a notification of formal counseling.[8] It advised Avila that he did not have any more FMLA time to cover future time off, and that any future time off had to be covered by a paid benefit and could not be covered by leave without pay. (Stills Aff. ¶ 13, Ex. 3 1012-001.) (ECF Nos. 28, 28-3.)

On September 28, Stills sent Avila a letter serving as official notice of a written warning for poor work performance.[9] Stills also notified Avila that any future violations of the work rules would result in further disciplinary action. (Stills Aff. ¶¶ 13-15, Ex. 4 1013-001.)

From September 2008 until January 2009, Avila was granted a

---

[8] There is a factual dispute regarding whether Avila had previously received informal counseling. (*See* Pl. Resp. Def. PFOF ¶¶ 56, 59.) The memo stated that Stills was proceeding with formal counseling since Avila had received informal counseling during the second quarter of the year. Avila avers that he did not receive informal counseling prior to receiving the September 22 memo. (*See id.*)

[9] There is a factual dispute as to whether Avila's work performance was poor. (*See* Pl. Resp. Def. PFOF ¶¶ 60, 61.) The claimed poor work performance was Avila's failure to restock toilet paper in a women's restroom. Avila avers that he always restocked when he cleaned the bathrooms, which have 3 or 4 stalls; each stall has 2 rolls of toilet paper approximately 12 inches in diameter. The rolls "rarely [got] down to nothing and it is impossible they would all be out at the same time." (Avila Aff. ¶ 39.)

leave of absence under the union contract. Avila was on an approved leave of absence for depression from November 18 through December 15, 2008. The leave was then extended to January 15, 2009.(Avila Aff. ¶ 42.)

On December 6, Avila emailed a "letter of concern" to Kolbe and Fujimoto regarding the September 28 written warning for poor work performance, stating that he believed the action against him was due to racism, unfair treatment, and retaliation. (*Id.* at ¶ 41, Ex. 7, Emails 0738.) He offered to explain the reasons for his opinion in detail, and he provided examples of complaints about the performance of employees in his "department and on the same shift" who "did not receive any disciplinary action nor was there any investigative meetings held for these employees." (*Id.*, Ex. 7, Emails 0738.) Avila related the episodes of the walk-behind scrubber falling off the loading dock and the radio dropped in the toilet. Avila also stated that Lott and Stills recently stated to fellow employees that they were going to make it their personal mission to get Avila fired. In addition, Avila said his:

> main reason for writing [Kolbe] this letter is for some record and proof that I did inform you of the things that go on at work. I have made many other reports to H.R. along with emails, and meetings with H.R. and the reports and complaints submitted to the Parkside Police and the Department of Equity and Diversity. It is a

> very stressfull [sic] situation to have to deal with harassment, retaliation, unfair treatment, rascism [sic], along with the recent fmla violations that I have been going through for a year now. I have now been going throug[h] all this sicne [sic] July 2007, today is December 2008. I would like for you to do something about this situation with these supervisors that do these things.

(*Id.*, Ex. 7 Emails 0739.) Kolbe forwarded the email to Lawton, Coronado-Romero, and Olsen.

In late December 2008, Avila contacted the Equal Employment Opportunity Commission ("EEOC") regarding filing a discrimination and retaliation complaint prior to his anticipated January return to work hoping that the retaliation and harassment he had experienced before his leave of absence would stop. (Avila Aff. ¶ 43.)

Avila forwarded his September 19 email to Fujimoto, explaining that it was a list of specific things to investigate regarding discrimination. The email also states:

> In our meeting you stated that I would run the risk of being disciplined for filing another complaint of discrimination. If you do decide to investigate the discrimination, I would like to request a letter from you to formaly [sic] notify me of the risk, and then I would like to decide if I want you to investigate the discrimination. Basically, I would like proof of why I decided not to have you investigate the discrimination, (the fear of being disciplined for filing a complaint of

> discrimination if there is insufficient evidence
> found to prove discrimination) if that is what I
> decide to do. Make no mistake, I believe there is
> discrimination but I know how the system works
> and do not want to put myself in a position where
> I will be at risk of losing my job in trying to
> address the discrimination. Thank you.

(Avila Aff. ¶ 38, Ex. 3 Emails 058.)

On January 14, 2009, Avila informed Stills by email that he would return to work at the beginning of the third shift on the night of January 15. He also informed Stills:

> I have sought legal councel [sic] and that any
> further harassment, discrimination, unfair
> treatment, FMLA violations or retatliation [sic] I
> recieve [sic] upon my return will be well
> documented. **A complaint was also filed with
> the EEOC in December of 2008**. I hope my
> return to work will be pleasant and I look forward
> to working in an environment that is now
> comfortable, safe, and productive.

(Avila Aff. ¶ 44, Ex. 8.) (Emphasis added.)

On January 21 at 4:00 a.m., Stills contacted Avila in his assigned work area and told him he was also to clean the concourse area. Avila responded that no one assigned to that area was ever made or expected to clean the area and clean the concourse because of its many aspects and heavy use. Avila also said that Christine Branch was never able to complete the entire area even when she worked an extra hour, and that

Stills and Lott knew it. Avila also stated Fred I., Kimberly Z., Debbie, Joe R., Mike, and others also were not able to complete the area. Avila asked Stills why Ed Caldwell ("Caldwell") could not clean the concourse area. Stills said he had assigned Caldwell to clean the upstairs hallway, and that the concourse was a priority. Avila asked Stills, given that the area was such a priority, why he had waited until 4:00 a.m. to raise the issue and why he had assigned Caldwell to clean upstairs instead of the concourse.

Avila said he would do the work, and that he had just gotten back and did not want any problems. He also stated that he would document the incident to the EEOC and his attorney to cause the retaliation to cease. Avila was trying to follow a "what to do if you're being harassed or discriminated against" pamphlet he got from a government website. (Avila Aff. ¶ 45.) According to Avila, Stills got mad, said he would have it out with Avila's attorney, and told Avila not to call him a fuckin' liar. Avila avers that Stills was aggressive in manner, tone, and stance, and yelled and cursed at Avila. Avila called the Parkside Police to report and document the incident. Stills was mad at Avila for calling the police. Avila spent about an hour and a half in a restroom with diarrhea and cramps due to the events of that evening.

On January 22, Avila sent an email to Fujimoto regarding the

January 21 incident, stating that he had tried to explain to Stills, in detail, that he was not being treated fairly and to politely give him examples. Avila stated that he told Stills he would do the work as directed but would document the incident and would be reporting retaliatory, harassing, and discriminatory treatment to his attorney and the EEOC; that Stills got very angry and aggressive, and Avila felt threatened, unsafe, uncomfortable, and physically not well; and that it was very emotionally unsettling, especially after just returning to work after a leave due to similar behavior. Avila said he had been threatened previously when Stills told him to get the fuck out of his office.[10] He said the January 21 incident had caused an anxiety attack and aggravated his condition, and he had reported it to his physician. Avila asked for an assurance before he returned to work that he would be safe and the behavior addressed. (Avila Aff. ¶ 46, Ex. 9.)

David Olsen ("Olsen"), the Assistant Director of Facilities Services, became involved in Avila's discipline because Fujimoto had told Lott that he should not have contact with Avila. By a January 27 email, Olsen informed Avila of a January 30 investigatory meeting for "a discussion

---

[10] Avila claims Stills made the statement when Avila was talking to him about being treated differently than other employees.

regarding alleged inappropriate activities on 1/21/-1/22/2009 in violation of Classified Employee Work Rule[s]" regarding insubordination and negligence in the performance of assigned duties. (Avila Aff. ¶ 48, Ex. 11.) Later that day Avila emailed Lawton regarding the January 21 incident, with a subject heading of "unfair treatment, retaliation, discrimination, and harassment 1-21-09." (Avila Aff. ¶ 47, Ex. 10 Emails 0349.)

On March 9, Olsen sent Avila a letter as official notice of a written reprimand due to violation of classified employee work rules on January 22. The written reprimand was a result of Avila's alleged failure to perform duties as Stills directed.[11]

On March 12, Stills sent Avila a letter serving as official notice of a one-day suspension for alleged poor work performance January 28 through February 2, 2009, when Avila did not sweep or empty the trash in a work room.[12]

On March 27, Olsen sent Avila a letter as official notice of a three-day suspension, based on the recommendations of Stills, Lott, and human

---

[11] There is a factual dispute regarding whether Avila cleaned the tables and chairs in his area on January 22. (*See* Pl. Resp. Def. PFOF ¶¶ 63-64.)

[12] There is a factual dispute regarding the claim of poor work performance. (*See* Pl. Resp. Def. PFOF ¶ 66.) Avila disputes the violation. Avila avers that the room was an art room and a lot of sawdust and clay got on the floor. It took a walk-behind scrubber to get it clean, and this was done only once a week. The trash, which was in the back of the room, was emptied only once a week. Avila avers that the room was not dirty, and if it had been, they would have taken photographs. (*Id.*; Avila Aff. ¶ 50.)

resources, for alleged poor work performance on March 9-10, 2009. The facilities management office had received a phone complaint that the soap dispensers in a men's bathroom were out of soap. A women's restroom also had one empty soap dispenser. The maintenance closet in the building had the soap necessary to fill the empty dispensers, and this was one of Avila's responsibilities.

Avila disputes that the suspension was a result of poor work performance. He avers that he had become paranoid and, therefore, checked everything. According to Avila, the bathrooms were stocked when he left at 6:00 a.m.; there are two or three dispensers, and it was not possible they all would be empty. Avila avers that Lott was the individual who allegedly found the dispensers empty, and that Kolbe could not say who complained. (Avila Aff. ¶ 51.)

On March 31, Avila emailed Olsen regarding his three-day suspension, saying that Lott was trying to set him up and that:

> As I told you, I know that I am going to be fired but I just want someone to know that what I said was true and maybe contribute something in documentation for future reference for someone else who is victim of Charles Lott in the future and whoever allows him to operate the way he does. I check those restrooms 3 times a night out of paranoia and I did not forget or neglect to stock any product.

There have been a number of things related to me that have gone missing after I filed complaints with the [OED] and after reporting things to the human resources department. I believe that with the number of things of mine that have gone missing along with the time line of these incidents, that there is too much evidence to believe that these incidents were all coincidental.

I think there is strong evidence, to demonstrate that these incidents were ploys to attempt to manufacture work violations in order to furtherance disciplinary action and with the number of incidents that this action was to achieve the goal of termination of my employment. Since July of 2007 I have been written up 14 times for a total of 26 work violations. I was found guilty of 2 of these work violations out of the 26 alleged. For one of the 2 guilty findings, evidence I provided to show that I did not commit any work violations was disregarded and ignored, the other alleged violation was very discriminatory and something that I did not do in the first place. All of this also retaliatory, discriminatory, and harassing in nature and making of a very hostile work environment. In summation and in chronological order the items that have gone missing and incidents are the following. The first thing that went missing were the keys I used in my daily job for the unlocking and locking of the classrooms and offices. This incident happened very shortly after trying to address some concerns I had with Charles Lott, which he did not appreciate. In this incident they're were only 2 people that had access and the opportunity to take the keys and they were Charles Lott and another co worker. I do not believe that co worker would take the keys. I had always stated that I did not misplace or lose the keys and that I believed that

[Lott] took the keys in retaliation for speaking up about the concerns I had regarding how I was being treated and for filing a complaint with the [OED] and to the human resources department. I reported this key incident to human resources and to the [OED]. I stated my thoughts on what [Lott] was trying to do (set me up for a work violation) and this seemed to put a halt on this particular write up. The keys mysteriously then reappeared a week later in very strange circumstances. The next thing of mine that went missing were my call in messages. I always stated that I had called in. I was wrote up for more work violations. I produced phone records to prove that I did call in and was able to stop this write up. The only person who had access to the phone call in system and password on this night was Charles Lott. All of this was again during the first investigation by the [OED] and after filing complaints against Charles Lott.

(Avila Aff. ¶ 52.)

Avila did not grieve the following discipline imposed against him: the September 28, 2008, written reprimand; the March 9, 2009, written reprimand; the March 12, 2009, one-day suspension; and the March 27, 2009, three-day suspension.

According to Avila, Lott sometimes came in at 3:30 a.m. to harass him, although Lott's shift started at 5:00 a.m. Avila requested that his hours be changed so he could avoid Lott. Avila avers that the harassment he experienced after returning to work in January was extremely hard on him and made his major depressive disorder worse. On April 27, 2009,

Avila's doctor recommended a disability leave. (Avila Aff. ¶ 53.)

In April 2009, Avila filed a formal OED complaint, claiming that Stills engaged in discrimination, harassment, and retaliation based on his race/ethnicity and disability. Avila claimed that the following actions took place as a result of his being Hispanic and having a disability, and that he was being retaliated against for questioning his supervisors and filing previous complaints:

> a. Numerous incidents have occurred that have resulted in disciplinary action being taken against Mr. Avila. He claims that his co-workers have engaged in similar actions with no disciplinary action occurring;
>
> b. Mr. Avila made requests to take leave from his job through use of the [FMLA]. Mr. Avila stated he was denied FMLA and harassed for requesting and taking FMLA;
>
> c. Mr. Avila made a request for reasonable accommodation from his supervisor Mr. Stills when he returned from leave to his job on 1/18/09. Mr. Avila claims this request was not granted, violating his rights as a person with a disability.

(Fujimoto Aff. ¶ 9, Ex. 7 1020-0001.)

On April 20, Fujimoto sent Avila his confidential investigation findings regarding Avila's complaint about Stills, informing Avila of the following conclusions:

> a. Regarding Mr. Avila's claims that numerous

incidents have taken place that have resulted in disciplinary action being taken against Mr. Avila and that his co-workers have engaged in similar actions with no disciplinary action occurring, there is insufficient evidence to confirm that such disparate treatment has occurred;

b. Regarding Mr. Avila's claims that he made requests to take leave from his job through use of . . . FMLA and that Avila was denied FMLA and harassed for requesting and taking FMLA, **there is reason for concern regarding how several incidents regarding the categorization of Mr. Avila's time off from work transpired as well as the frequency and timing of memos to Mr. Avila;**

c. Regarding the third section of the complaint that Mr. Avila made a request for reasonable accommodation and that his request was not granted, Mr. Avila's request was under consideration when Mr. Avila terminated his permission for release of information from his health care provider. Lacking adequate information from Mr. Avila's health care provider prevents the university from determining whether reasonable accommodation can and will be provided. There is no indication that Mr. Avila has been treated inappropriately in this area.

(Fujimoto Aff. ¶ 10, Ex. 7 1020-011, 012.) (Emphasis added.)

On April 27, upon the recommendation of his physician, Avila requested a 90-day "leave of disability" due to "major depression disorder," with a scheduled return date of July 25. Avila's psychiatrist provided a note stating Avila was "unable to work due to increased depression —

recommend leave of disability 90 days." (Avila Aff. ¶ 54.) Avila was not eligible for FMLA leave because in the previous 12 months he had not worked the federal minimum of 1,250 hours required to qualify.

The six months of leave Avila was allowed under the union contract ended July 7, 2009. Avila indicates he used all his union leave and exhausted his FMLA leave because of workplace stress due to Stills' and Lott's retaliatory conduct. Avila avers that the stress caused severe depression and Crohn's disease[13] symptoms and he was unable to work. (Avila Aff. ¶ 55.)

---

[13] The Court has corrected Avila's misspelling of "Crone's" disease."

"Crohn['s] disease is one of the principal forms of inflammatory bowel disease . . . Characteristics include scarring and thickening of the bowel wall that frequently leads to intestinal obstruction, abscesses, and fistula formation. There is a high rate of recurrence after treatment." www.Dorlands.com (last visited Feb. 4, 2015).

Symptoms include "diarrhea with abdominal pain . . . Established Crohn['s] disease is rarely cured but is characterized by intermittent exacerbations and remissions. Some patients have severe disease with frequent, debilitating periods of pain. However, with judicious medical therapy and, where appropriate, surgical therapy, most patients function well and adapt successfully." www.merckmanuals.com

The American College of Gastroenterology's practice guidelines for *Management of Crohn's Disease in Adults* state:

> The issue of stress initiating or exacerbating [Crohn's disease] remains controversial. **Although many patients (and family members) are convinced that stress in an important factor in the onset or course of illness, it has not been possible to correlate the development of disease with any psychological predisposition or exacerbations to stressful life events.**

Vol. 96, *Am. Journal of Gastroenterology,* 635 (2001). (Emphasis added).

Human Resources' protocol was to request a medical opinion as to when an employee could return to work prior to a final decision regarding termination. (Davey Aff. ¶ 2, Ex. A (Lawton Dep.) 22-24.) If the leave was up and there was no foreseeable date the employee could return to work, he would be medically discharged. Typically human resources also contacted an employee's department prior to a decision to terminate an employee on leave. Regarding Avila's termination, the human resources director would have talked to Stills to get his input. Lawton talked to Stills at times, but she did not remember "a final conversation of saying 'do you want to terminate.'" Although Stills had input, the decision was not his to make. (Davey Aff. ¶ 2, Ex. A 35.)

There a factual dispute regarding Lott's involvement with the decision to terminate Avila's employment. According to Lawton, while Avila was on leave Lott called her inquiring when the leave would be over, asking if the rules regarding leave were being followed, and telling her he wanted to know when he could fill the position. (*Id.*, Ex. A 36, 40, 58-60.) However, at his deposition, Lott testified that he did not call human resources before the termination of Avila's employment to find out when he could fill the position. (*Id.* at ¶ 4, Ex. C (Lott Dep.) 35-40.) He also testified that he was not involved in the decision to terminate Avila's

employment, and that he learned of the termination and the reason for it from Olsen after its occurrence.

Lawton did not know what Lott and Stills discussed about Avila. She knew only that a decision had been made that leave time was going to be up and they would need to replace the position. (Davey Aff. ¶ 2, Ex. A 36.)

On June 4, 2009, Coronado-Romero sent Avila a letter informing him that his employment would be terminated for medical reasons when he exhausted the leave of absence due under the WSEU contract.

On June 18, Coronado-Romero sent Gerald Boyle ("Boyle") at the Wisconsin Department of Administration a letter referring Avila to the State Injured Worker Re-employment Program. Coronado-Romero outlined Avila's situation, indicating that he had been on medical leave since April, that his FMLA leave rights were exhausted, and that his leave of absence rights under the WSEU contract would be exhausted shortly. Romero asked Boyle to advise Avila if he was a candidate for any available services.

Coronado-Romero also sent Avila a letter that served as the "official notice to terminate (his) employment for medical reasons effective July 7, 2009." (Johnson Aff. Ex. 1 1006-004.) The letter stated, "[w]e regret

having to make this decision, but your inability to return to work and the expectation of your employment unavailability at present, makes this decision necessary." (*Id*.) Copies of the letter were sent to Stills, Lott, Kolbe, Lawton, Linda Busha ("Busha"), the HR employee who handled medical leave, and others.

Avila called and emailed Busha, informing her that his leave had been approved and indicating that he did not understand why he was being terminated. He was not told that he needed additional documentation from his doctor about his expected return date. The request form that approved Avila's medical leave included an expected return-to-work date of July 25, 2009. (Avila Aff. ¶ 72.) Avila does not provide a citation to any underlying leave form, but a form dated April 29 requesting 90 days of leave, with a scheduled return date of July 25, 2009, has a notation in the human resources review section stating, "Leave approved thru July 7 per WSEU contract provision." (Johnson Aff. ¶ 4, Ex. 1 1006-001.)

Prior to his termination, Avila gave Lawton, Lott, Stills, and others informational brochures from the EEOC website which provided enforcement guidance regarding reasonable accommodation and undue hardship under the Americans with Disabilities Act. The brochures stated that an employer may not apply a "no-fault" leave policy, under which

employees are automatically terminated after they have been on leave a certain period of time, to an employee with a disability who needs leave beyond that period. (Avila Aff. ¶ 66.)

On July 6, Avila emailed Lawton stating:

> I am requesting that my employment not be terminated and that I be allowed to continue with my medical treatment and therapy until fully recovered or able to return to work which ever [sic] comes first. I am also requesting that my job position be held open for me and my work benefits be continued as it has been for past and current employees in similar situations. I would like to work in an environment free of discrimination of [sic] disability.

(Avila Aff. ¶ 67, Ex. 13.)

On July 8, Lawton emailed Avila the following reply to his July 6 email: "Ceasar, I have received your recent email, but in accordance with the medical discharge letter, you have been discharged effective July 7, 2009. Peg" (Avila Aff. ¶ 68, Ex. 14.)

Prior to receiving official notice of his termination, Avila was not told to get documentation from his doctor regarding the date he was expected to be able to return to work. No representative of UW Parkside told Avila, before or after his termination, that extending his leave of absence beyond July 25 would create an undue hardship.

Avila sent numerous emails to Lawton, Fujimoto, Kolbe, and others which identified custodians who engaged in conduct that violated UW classified employee work rules but had not been disciplined, providing the names, dates, and conduct in many instances. He was never told that this information was incorrect.

Avila has Crohn's disease and major depression disorder. His doctors provided documentation of those conditions and indicated that they were made worse by stress at work and were the reason for his leave of absence. Avila avers that he had a major depression disorder caused by stress at work and that he was not able to work the required hours because of that disorder. (Avila Aff. ¶¶ 65, 71.)

### Avila's EEOC Complaints

Avila filed an EEOC Charge of Discrimination dated January 29, 2009, alleging discrimination based on sex, national origin, retaliation and disability beginning on January 1, 2008. (Johnson Aff. ¶ 7, Ex. 2.) He filed another EEOC Charge of Discrimination dated January 15, 2010, alleging discrimination based on sex, national origin, retaliation and disability as a result of his employment termination. (Johnson Aff. ¶ 8, Ex. 3.)

### ANALYSIS

The Board contends that Avila's 42 U.S.C. § 1981 claims should be

dismissed because it possesses Eleventh Amendment immunity. It also asserts that Avila's Title VII claims — to the extent they seek punitive damages — cannot survive summary judgment based on the language of Title VII itself, which precludes punitive damages against governmental entities.

### *Section 1981 & Title VII Punitive Damages Claims*

Avila's summary judgment opposition brief does not respond to the Board's argument that his § 1981 claims are barred by the Eleventh Amendment, or to the contention that a Title VII plaintiff may not recover punitive damages against a government entity.

It is black-letter law that states and their agencies cannot be sued in federal court unless they unequivocally consent to suit or unless Congress unequivocally abrogates their Eleventh Amendment immunity pursuant to a valid exercise of power. *See Gomez v. Ill. State Bd. of Educ.,* 811 F.2d 1030, 1036 (7th Cir. 1987). The Seventh Circuit has held that § 1981 claims against state agencies are barred by the Eleventh Amendment because it was not abrogated by Congress in its enactment of this federal statute. *See Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1184 (7th Cir. 1982) (citing *Quern v. Jordan,* 440 U.S. 332 (1979)). The Board is an "arm of the state" for Eleventh Amendment purposes. *See Joseph v. Bd. of*

*Regents of Univ. of Wis. Sys.,* 432 F.3d 746, 748 (7th Cir. 2005). The Board has not unequivocally consented to suit. Therefore, because Congress did not abrogate the states' Eleventh Amendment immunity in enacting § 1981, and Wisconsin has not waived this immunity, Avila's § 1981 claims are dismissed.

The text of Title VII does not allow for the recovery of punitive damages against a "government, government agency, or political subdivision." 42 U.S.C. § 1981a(b)(1); *Hildebrandt v. Ill. Dep't of Natural Res.,* 347 F.3d 1014, 1031 (7th Cir. 2003); *Baker v. Runyon,* 114 F.3d 668, 669-70 (7th Cir. 1997) (interpreting § 1981a(b)(1) to broadly include all government agencies). Again, the Board is an arm of the state. *Joseph,* 432 F.3d at 748. Therefore, Avila's Title VII punitive damages claim is dismissed.

### *Title VII Discrimination and Retaliation Claims*

The Board asserts that Avila's Title VII national origin, hostile work environment, and retaliation claims should be dismissed because he was discharged for medical and leave-time reasons, not national origin reasons, and there is insufficient evidence to show that a hostile work environment existed. In addition, with respect to his retaliation by termination and by hostile work environment claims, the Board maintains that there is no

evidence of any causal connection between his alleged protected activity and the Board's action.

To avoid summary judgment, Avila has to present evidence showing that the suspensions and/or the termination of his employment and/or hostile work environment were motivated by his race/national origin or were in retaliation for his complaints. *See Hester v. Ind. State Dep't of Health,* 726 F.3d 942, 946-47 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1492 (2014); *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("[T]he plaintiff one way or the other must present evidence showing that . . . a rational jury could conclude that the employer took that adverse action on account of [his] protected class, not for any non-invidious reason."). Avila contends that he has presented sufficient evidence under the indirect method of proof to overcome summary judgment on his retaliation claim, and that he has also presented sufficient evidence under the direct and indirect methods to avoid summary judgment on his race/national origin discrimination claim. The Court begins, as has Avila, with the analysis of his Title VII retaliation claim.

### Retaliation Claims

For purposes of the motion, the Board concedes that Avila engaged in protected activity and was subjected to material adverse action. (Def.

Mem. Support Summ. J. 32.) (ECF No. 23.)  The Board states that it does not understand Avila to allege a retaliation claim based on any employer action other than termination and a hostile work environment.  (*Id.* at n.4.)

However, in his opposition brief, Avila contends that his March 12, 2009, one-day suspension, his March 27, 2009, three-day suspension, and his July 7, 2009, termination individually and collectively constitute materially adverse actions.  (Pl. Opp'n Br. 5.) (ECF No. 35.)  He also asserts that the harassment he experienced was a materially adverse action.  (*Id.* at 5-6.)

Avila further contends that there is evidence from which a reasonable jury could find he was not treated the same way as other similarly situated employees; and, given that UW Parkside was not required to terminate his employment due to the exhaustion of his medical leave, that his termination was the result of hostile work actions caused by discriminatory and retaliatory conduct.  He further asserts a reasonable jury could find that UW Parkside's failure to address his discrimination and retaliation complaints led directly to the exacerbation of his medical conditions, causing him to exhaust his medical leave and give UW Parkside the justification for its retaliatory termination of his employment.

In reply, the Board contends that Avila has not proven his hostile work environment claim, and that even if he had done so he did not prove that it was retaliation for protected activity. In so contending, the Board cites *Luckie v. Ameritech Corp.,* 389 F.3d 708, 715 (7th Cir. 2004), indicating that the employer "must have had actual knowledge of the complaints for . . . decisions to be retaliatory," and *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012), indicating that "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." (Def. Reply Mem. 10-11.) (ECF No. 41).[14]

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to retaliate against an individual who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff may prove Title VII retaliation claims by using

---

[14] The statements cited by the Board were made by the appeals court in analyzing retaliation claims under the direct method of proof. Although not explicitly invoked by Avila, the Court has considered Avila's hostile work environment retaliation claim under the direct method of proof. With respect to Avila's hostile work environment retaliation claim, the parties' briefs address two issues — whether the environment meets the standard for a hostile work environment, and whether there is a causal relationship between the protected conduct and any such environment.

either the direct or indirect methods. *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011).

## Indirect Method of Proof

The indirect method of proof, invoked by Avila, requires showing that "(1) he engaged in a statutorily protected activity; (2) he met his employer's legitimate expectations, i.e., he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity." *See Harper,* 687 F.3d at 309. In a sense, the indirect approach represents a lower burden because "a plaintiff so proceeding need not show even an attenuated causal link." *Stone v. City of Indianapolis Pub. Utilities Div.,* 281 F.3d 640, 644 (7th Cir. 2002.)

"Materially adverse actions" are those that might dissuade a reasonable employee from engaging in protected activity. *Benuzzi*, 647 F.3d at 665 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); this category sweeps more broadly than the "adverse employment actions" required to sustain a discrimination claim, *see Thompson v. N. Am. Stainless, LP*, 131 S.Ct. 863, 868 (2011). The Seventh Circuit Court of Appeals construes adverse action taken in retaliation

- 42 -

"quite broadly." *Smith v. Ne. Ill. Univ.,* 388 F.3d 559, 568 (7th Cir. 2004) (citing *Knox v. State of Ind.,* 93 F.3d 1327, 1334 (7th Cir. 1996) (describing retaliatory adverse actions as that which "put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like secretarial help or a desktop computer), or cutting off challenging assignments"). However, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Id.* (citation omitted).

A plaintiff must meet each element of a prima facie case to survive summary judgment under the indirect method. *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1104-05 (7th Cir. 2012); *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179-80 (7th Cir. 1997). In this case, a disputed element is whether Avila was meeting his employer's legitimate employment expectations. *See Sklyarsky v. Means-Knaus Partners, L.P.,* No. 13-3302, 2015 WL 363910, at *3, (7th Cir. Jan. 29, 2015). It is undisputed that as of April 2008 Lott and Stills rated Avila as not meeting expectations in four out of five categories. While this evaluation showed a

failure to meet expectations, it was almost a year old by the time of Avila's March 12, 2009, one-day suspension. Moreover, Avila has raised factual disputes regarding the specific claims of his poor work performance on September 28, 2008, January 21-22, January 28-February 2, and March 9-10, 2009. Construing the evidence in the light most favorable to Avila, a reasonable jury could find that he was performing adequately in the early fall of 2008 and after returning to work in January 2009.

Avila must also present sufficient evidence that similarly situated employees were treated differently. In general, a plaintiff who believes another individual is "similarly situated" must at least show that this "comparator" (1) "dealt with the same supervisor," (2) "w[as] subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Orton-Bell v. Ind.,* 759 F.3d 768, 777 (7th Cir. 2014). Despite construing the evidence in the light most favorable to Avila, he has not presented evidence that other custodians who resisted a supervisor's directions, or had similar alleged poor work performance, or exhausted sick leave were treated differently. Thus, Avila has failed to establish a prima facie case of retaliation with respect to his suspensions and termination.

Even if Avila were deemed to have established such a case, with respect to retaliation by termination, the Board has presented a legitimate non-discriminatory reason — the exhaustion of his medical leave. Avila has presented evidence that UW Parkside had the discretion to extend his medical leave. Avila also has raised factual disputes regarding the extent to which Lott was involved in discussions during summer 2009 regarding his sick leave and termination. However, even accepting that UW Parkside had the discretion to extend Avila's leave and that Lott was involved in the termination decision, Avila has not presented any evidence indicating that the Board's justification is pretextual, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain [Avila's] discharge." *See Harper,* 687 F.3d at 311 (quoting *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011)). In other words, the question is whether the Board's justification is "a lie." *Id.* (citation omitted). To meet this burden the plaintiff "'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [the Board's] stated reason 'that a reasonable person could find [it] unworthy of credence.'" *Id.* (citation omitted). Avila has not presented evidence that calls into question the veracity of UW Parkside's assertion that the

exhaustion of Avila's medical leave led to his termination. Therefore, Avila's retaliation claims based under the indirect burden-shifting method of proof are dismissed.

### Hostile Work Environment

Avila also asserts that he was subjected to a hostile work environment in retaliation for his protected conduct. "The creation of a hostile work environment can be a form of retaliation." *See Smith,* 388 F.3d at 567 n.5. Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.,* 133 S. Ct. 2434, 2440 (2013). In order to prevail on such a claim, a "plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id.* at 2441. To avoid summary judgment on a hostile work environment claim, a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [the protected conduct] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability. *See Chaib v. Ind.,* 744 F.3d 974, 985 (7th Cir. 2014) *cert. denied,* 135 S. Ct. 159 (2014); *Milligan v. Bd. of Trs. of S. Ill. Univ.,* 686 F.3d 378, 383 (7th Cir. 2012); *Lloyd v.

*Swifty Transp., Inc.,* 552 F.3d 594, 603 (7th Cir. 2009).

In order to prove a hostile work environment claim, "the alleged harassment must be 'both subjectively and objectively so severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment.'" *Whittaker v. N. Ill. Univ.,* 424 F.3d 640, 645 (7th Cir. 2005) (citation omitted). Moreover, a hostile work environment is one that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807 (7th Cir. 2000). In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors may be considered, including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher,* 524 U.S. at 787-88; *Hostetler,* 218 F.3d at 806. Moreover, the alleged discriminatory conduct cannot be considered in a vacuum; rather, an employee's claim must be evaluated in light of the social context in which events occurred. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998). Still, Title VII

"does not set forth a general civility code for the American workplace" and it does not protect employees from normal petty slights, minor annoyances, or the simple lack of good manners. *Burlington N. and Santa Fe,* 548 U.S. at 68

Viewed in the light most favorable to Avila, the evidence demonstrates a pattern: Avila complained, Lott or Stills or Olsen (in lieu of Lott) responded adversely. The summary below is not exhaustive.

1. **Early summer 2007.** Avila complains to Lott about being treated differently than white lead custodians — Lott presents a claim of 3 work violations, one is sustained. Missing keys were the basis for one non-sustained alleged violation; Avila cites facts to support his belief that Lott intentionally caused Avila's keys to disappear for a while.

2. July 24. Avila makes an informal OED complaint about unfair treatment — Lott confronts Avila, yells and curses, issues alleged work rule violations.

3. August 16. Avila makes a formal OED complaint — August 17 and August 20: Lott issues memos alleging work rule violations regarding Avila's failure to call in an absence. Avila presents evidence that he had called in, incident blamed on phone system.

4. Lott used term "spic and span," emphasizing "spic," when talking to Avila about cleaning.

5. **February 22, 2008.** Avila files formal OED complaint — April 13: Lott and Stills issue Avila's "does not meet expectations" in four out of five categories evaluation. Avila disputes evaluation.

6. June. Avila overhears Lott refer to him as a "wetback" when stating that no "wetback" is "funna" get rid of him.

7. August 7. Stills issues alleged work violation against Avila.

8. September 19. Avila indicates he intends to file a formal complaint of discrimination by Lott and Stills — September 22: Stills issues notice of formal counseling, incorrectly claiming to have previously provided informal counseling; September 28: Stills issues written warning of poor work performance.

9. **January 2009**. Avila notifies Stills about the EEOC complaint he filed in December — January 21: concourse cleaning incident between Stills and Avila; January 27: Avila informed of alleged work rule violations relating to January 21-22 incident; March 12: Stills gives Avila a one-day suspension due to poor work performance January 28-February 2; March 27: Olsen notifies Avila of three-day suspension based on recommendation of Stills,

Lott, and human resources.

10.    April. Avila files formal OED complaint against Stills — Avila
       begins 90-day leave of absence due to major depression made
       worse by harassment at work; June 18: Avila advised by
       Coronado-Romero that his job will terminate on July 7, 2009.

Lott's conduct toward Avila from the summer of 2007 through June 2008 as claimed was certainly inappropriate, unprofessional, and unpleasant, and could reasonably be considered worse when viewed as a whole. By August 2008, Stills' conduct against Avila had escalated, and the record suggests that the workplace conduct was taking a toll on Avila, who was on medical leave from the fall of 2008 into early 2009. Additional incidents occurred after Avila returned to work. When considered collectively, a reasonable jury could find that the incidents of which Avila complains are severe and pervasive enough to constitute a hostile work environment that might reasonably dissuade him from engaging in protected conduct. *Compare Coffman v. Indianapolis Fire Dep't,* 578 F.3d 559, 564 (7th Cir. 2009) (stating that "[u]ndoubtedly the repeated driving evaluations and the fitness for duty examinations were subjectively unpleasant . . . it could not have been easy for Coffman to go through the repeated critiques of her driving, her paramedic skills, and her mental

stability. Nonetheless, we do not think the evaluations amounted to demeaning, degrading, or hostile behavior by the defendants.") Interpreted in the light most favorable to Avila, the evidence reasonably presents a situation which objectively and subjectively can be viewed as creating a hostile work environment. Furthermore, as illustrated by the above summary, there is sufficient evidence upon which a reasonable jury could find that Avila was subjected to a hostile work environment in retaliation for engaging in protected conduct. Therefore, summary judgment on Avila's hostile work environment retaliation claim is denied.

### *Discrimination*

With respect to his race/national origin discrimination claim, Avila contends that he has adduced substantial circumstantial evidence which, when considered in its totality and in the light most favorable to him, points directly to racial discrimination. With respect to the Board's contention that his employment was terminated "for medical reasons and lack of leave time," Avila contends that a reasonable jury could find that the stated reason for the termination of his employment is a pretext.

"Under the direct method, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motivation." *Collins v. Am. Red Cross,* 715 F.3d 994, 999 (7th Cir. 2013).

"Direct evidence is evidence which 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Hanners v. Trent,* 674 F.3d 683, 691 (7th Cir. 2012) (citation omitted). Direct evidence of discrimination under Title VII "is something close to an explicit admission by the employer." *Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 587 (7th Cir. 2011). Short of that though, a plaintiff can still succeed on the basis of circumstantial evidence under the direct method by "construct[ing] a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Brown,* 700 F.3d at 1105 (internal quotation marks omitted). The evidence that makes up the "mosaic" generally falls into three categories: 1) evidence that suggests suspicious timing and statements; 2) evidence that "similarly situated employees were treated differently;" and 3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Cloe v. City of Indianapolis,* 712 F.3d 1171, 1180 (7th Cir. 2013) (internal quotation marks omitted). Whatever the sort of circumstantial evidence offered to prove discrimination, such evidence "must point directly to a discriminatory reason for the employer's action." *Rhodes v. Ill. Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004).

Furthermore, not all actions that an employee may consider

adverse, such as cautionary notices and disfavored scheduling, have any tangible job consequences such that they constitute independent bases of liability under Title VII. *See Benuzzi,* 647 F.3d at 663 (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) ("At the very least, [plaintiff] must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference.")); *see also Lloyd,* 552 F.3d at 602 ("[W]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions."); *Grube v. Lau Indus., Inc.,* 257 F.3d 723, 728 (7th Cir. 2001) ("Lau's decision to change Grube's working hours certainly does not rise to the level of an adverse employment action. Grube's pay and job title remained the same, and she suffered no significantly diminished job responsibilities.").

Avila cites the "spic and span" comment Lott made while talking to Avila about a cleaning duty. This stray comment is not linked to any discriminatory conduct by Lott. Avila also relies upon a June 2008 statement, "no wetback is funna (slang) get rid of me," that he asserts Lott made to Stills. A remark can raise an inference of discrimination when "(1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook Cnty.*

*Sheriff's Dep't,* 602 F.3d 845, 850 (7th Cir. 2010). Isolated comments made over a year before an adverse action are not evidence of discrimination under the direct method. *See Tank v. T-Mobile USA, Inc.,* 758 F.3d 800, 806 (7th Cir. 2014).

"When proceeding under the direct proof method, in order for allegedly discriminatory remarks to 'qualify as direct evidence of discrimination, the plaintiff must show that the remarks were related to the employment decision in question.'" *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1089 (7th Cir. 2000) (citation omitted). Even when reasonable inferences are drawn in Avila's favor, he has not shown that either of Lott's statements were close in time or otherwise related to his March 2009 one- and three-day suspensions, or his July 2009 termination. Stills and Olson were involved in the one-day suspension, and Coronado-Romero and Lawson made the final decision to terminate Avila's employment when he exhausted his medical leave of absence. While Lott was involved in the three-day suspension, there is no evidence connecting his stray comments to that incident.

Nor has Avila presented evidence that similarly situated non-Hispanic employees were treated differently. He has not identified any co-worker who exhausted his or her sick leave. Furthermore, he has not

presented evidence that actions resulting in the damage or destruction of equipment are comparable to insubordination or failure to complete job duties.

Under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), Avila must establish a prima facie case of discrimination and show that the Board's proffered "legitimate, nondiscriminatory reasons for their actions . . . were pretextual." *Egonmwan,* 602 F.3d at 850. To establish a prima facie case of discrimination, Avila must show membership in a protected class, that he was meeting UW Parkside's legitimate expectations, suffered an adverse employment action, and was treated less favorably than a similarly situated employee outside of the protected class. *See Sklyarsky,* 2015 WL 363910, at *3. The Court's previous analysis regarding the lack of a prima facie case with respect to similarly situated employees and adverse employment actions also applies to Avila's discrimination claim, as does his failure to show that UW Parkside's reason for terminating his employment was a pretext for discrimination.

While Avila also relies on a hostile work environment with respect to his racial discrimination claim, he has not presented sufficient evidence to connect any such environment to his race/national origin. Lott's

antagonism towards Avila began sometime after Avila's first complaint to him. Stills' conduct does not include any racial connection.

Based on the foregoing, Avila's Title VII discrimination claims are subject to dismissal.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Board's summary judgment motion (ECF No. 22) is **DENIED** with respect to Avila's Title VII retaliation claim based on a hostile work environment, and **GRANTED** with respect to Avila's § 1981 claims and his Title VII discrimination claims, his other retaliation claims, and his claim for punitive damages.

Dated at Milwaukee, Wisconsin, this 5th day of March, 2015.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**